Edgardo **GIERBOLINI–COLON,**
Plaintiff, Appellee,

v.

Awilda **APONTE–ROQUE, etc., et al.,**
Defendants, Appellants.

No. 87–1675.

United States Court of Appeals,
First Circuit.

Heard Feb. 3, 1988.

Decided June 10, 1988.

---

José Andreu Garcia with whom Hector Rivera Cruz, Secretary of Justice, and Andreu Garcia & Andreu Garcia were on brief for defendants, appellants.

Pedro Miranda Corrada with whom Hector Urgell Cuebas was on brief for plaintiff, appellee.

---

* Of the District of Massachusetts, sitting by designation.

**1.** We take judicial notice that the NPP and the PDP are the two major political parties in Puer-

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and CAFFREY,* Senior District Judge.

·LEVIN H. CAMPBELL, Chief Judge.

Government officials of the Commonwealth of Puerto Rico appeal from a district court judgment holding them liable for violating the First Amendment rights of plaintiff-appellee Edgardo Gierbolini Colon ("Gierbolini"). 666 F.Supp. 334 (1987).

In 1970 Gierbolini began work at WIPR, a radio station owned and operated by the Department of Education of the Commonwealth of Puerto Rico. Initially a scriptwriter, Gierbolini progressed through the ranks and in January 1980 was appointed interim director of the station. On September 6, 1984, he received a permanent appointment as station director, subject to his satisfactory completion of a probationary period, which was to expire on April 30, 1985. *See* P.R. Laws Ann. tit. 3, § 1333(9)(c) & (10) (1978) (probationary appointments). In elections held in November 1984, the incumbent governor of Puerto Rico, Carlos Romero Barcelo, a member of the New Progressive Party ("NPP"), was defeated by Rafael Hernandez Colon, the gubernatorial candidate of the rival Popular Democratic Party ("PDP").[1] In December 1984, just before Romero Barcelo's NPP administration was due to expire, Gierbolini received a favorable job evaluation from one Quinones, who was the General Manager of Radio and Television within the Department under the Romero Barcelo administration. In January 1985, the new PDP administration took power. Appellants Awilda Aponte Roque and Agustin Mercado Rosa, appointees in Governor Hernandez Colon's incoming PDP administration, assumed their respective positions as Secretary of the Department of Education and General Manager of Radio and Television, replacing the former officeholders. In April 1985, Gierbolini, a member of the

to Rico. While there are other parties, these have typically drawn a small fraction of the popular vote.

NPP, received a negative evaluation from Mercado Rosa, Quinones's successor. On May 22, 1985, Gierbolini received a letter from Secretary Aponte Roque, informing him that since he had not satisfactorily completed the probationary period, he could not continue as director, and would revert to his position as a scriptwriter.

Gierbolini brought suit under 42 U.S.C. § 1983 (1982) for injunctive relief and damages, alleging that his demotion [2] violated both the First Amendment (it was politically motivated) and the Due Process Clause of the Fourteenth Amendment (he was not given a prior hearing). The complaint named as defendants Awilda Aponte Roque and Agustin Mercado Rosa, in both their official and individual capacities. After a bench trial the district court entered judgment for plaintiff, ordering his reinstatement as director of the station and finding defendants jointly and severally liable for a damages award composed of back pay, compensatory damages, and punitive damages.[3]

Appellants, Mercado Rosa and Aponte Roque, claim that two of the district court's factual findings, essential to its decision, were clearly erroneous.[4] These findings are 1) that political animus was the motivating factor in the decision to demote Gierbolini and 2) that appellants did not prove a valid alternative reason (assuming there *was* political animus) for demoting Gierbolini.

Our standard of review here is dictated by Fed.R.Civ.P. 52(a): "Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses." To conclude that the court's findings were clearly erroneous, we must, upon examination of the evidence in its entirety, be "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

## 1. POLITICAL MOTIVATION

Appellants' argument on this issue is simple. They contend the court could not have found their demotion of Gierbolini to have been politically motivated because there was no evidence that they actually knew of Gierbolini's political affiliation.

2. Throughout this opinion we will use the word "demotion" as shorthand to describe appellants' decision not to allow Gierbolini to continue as station director, causing him to revert to his scriptwriter status.

3. This lawsuit differs in two significant respects from the garden variety political discrimination suit arising out of the 1985 changing of political administration in Puerto Rico. First, appellants do not argue that the position of director of the radio station is one for which political affiliation might be an appropriate qualification, so that demoting Gierbolini because of his party affiliation would be permissible. *See Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). It is undisputed that the director is a "regular career employee" under the laws of Puerto Rico, *see* P.R.Laws Ann. tit. 3, § 1349 (1978), and is not freely removable even under the Puerto Rico civil service law. Puerto Rico itself, therefore, does not treat the position as one where a particular administration is entitled to insist on appointing someone with whom it has special affinity.

Second, appellants do not claim they were entitled to qualified immunity. Although they were sued in both their official and individual capacities, and raised an affirmative defense of qualified immunity in their answer, both defendants entered into a pretrial stipulation, whereby they "waived the qualified immunity defense only for the purpose of compensatory damages, injunction and the use of the rules of civil procedure, but not as to punitive damages." The district court's opinion made no mention of qualified immunity, and appellants have not argued immunity in their brief. Despite the limited nature of appellants' waiver, neither the notice of appeal nor appellants' brief specifically contest the validity of the district court's substantial punitive damages award. We therefore do not consider the propriety of such an award. *See Rowlett v. Anheuser–Busch, Inc.*, 832 F.2d 194, 205–07 (1st Cir.1987) (describing circumstances in which punitive damages are proper in civil rights actions).

4. Appellants also contest the district court's ruling that Gierbolini's firing was unconstitutional because he was not afforded a prior hearing. Because we uphold the district court's ruling on the First Amendment claim, we have no occasion to decide whether a prior hearing was necessary.

Appellants both denied such knowledge in their sworn testimony.

■ There was, indeed, little direct evidence that appellants knew Gierbolini belonged to the NPP. Gierbolini testified on direct examination as follows:

Q. Mr. Gierbolini, what is your political affiliation?

A. I am a member of the New Progressive Party.

Q. Since when have you been a member of the New Progressive Party?

A. Since 1969.

Q. Do you know whether defendants knew about your political affiliation?

A. Yes.

Q. Did they know?

A. I am sure.

Q. Did you manifest your political affiliation publicly?

A. Yes, I have. I have always been a member of the New Progressive Party. I am a friend of ex-governor Carlos Romero Barcelo since we were young men. We used to live near. I have always known him. I performed in La Fortaleza [the governor's mansion] quite often during his tenure as governor concerts that were recorded and broadcasted by WIPR. So everybody at WIPR knows I am a member of the New Progressive Party.

This testimony was bolstered by the circumstantial evidence consisting of the fact that Gierbolini had been appointed as director in September 1984, when the NPP was still in power. The court could reasonably infer that appellants knew this, and that they would have deduced from the circumstances that Gierbolini was allied with the same party as was the administration that appointed him. Increasing the likelihood of appellants' knowledge was the timing of Gierbolini's appointment: he was named director on September 6, 1984, only

days before the beginning of the statutory freeze imposed on personnel actions for a two-month period before and after the general election. *See* P.R.Laws Ann. tit. 3, § 1337 (1978). Appellants might have doubted that an NPP administration would take such pains to appoint Gierbolini at the eleventh hour if he were not affiliated with the NPP. The case for appellants' political motivation was further strengthened by evidence that the person they promptly installed to replace Gierbolini was a member of their own party, the PDP. That appellants did not even discuss Gierbolini's alleged inadequacies with him, but simply proceeded to strip him of the director's post at the earliest opportunity, again suggests that a motive other than a simple concern for merit was at work.

To be sure, Gierbolini conceded on cross-examination that he was not a political "activist"; that he did not boast of his relationship with former governor Romero Barcelo; that he had not publicly expressed (through the media) his political preferences; and that he did not engage in political arguments while in the radio station. And appellants denied knowing Gierbolini's political affiliation. But given that his appointment had occurred when the rival party was still in power, that he was demoted almost immediately after appellants' party took office, and that his successor was of the latter party, we think the district court could reasonably infer that appellants believed Gierbolini belonged, as he did, to the rival NPP.

This is not to say there could not be more than one permissible view of this evidence. But we are left with no "definite and firm conviction" that the district court made a mistake in concluding on this record that appellants were aware of Gierbolini's political affiliation.[5]

Appellants insist that the district court arbitrarily "presumed" their knowledge of

---

5. There was also Gierbolini's testimony that because he performed as an artist at La Fortaleza during Romero Barcelo's governorship "everybody at WIPR knows I am a member of the New Progressive Party." There was no objection to this testimony, and he was not cross-examined about it. Absent objection, this became

part of the corpus of evidence the district court could consider. *See Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 624–25 (1st Cir.1988). The district court was better situated than ourselves to determine what weight to give to this testimony.

Gierbolini's affiliation. They cite cases standing for the proposition that such a presumption is impermissible. *See Laskaris v. Thornburgh,* 733 F.2d 260, 265–66 (3d Cir.1984); *Colon Velez v. Santiago de Hernandez,* 440 F.Supp. 432, 433 (D.P.R.1977). Obviously the court could not just "presume" such knowledge in the absence of evidentiary support. However, the court was entitled to find knowledge if the record contained sufficient circumstantial evidence to support such a finding.[6] Circumstantial evidence can be as probative as direct evidence. And we owe the same deference to reasonable inferences the district court might properly draw from the facts properly before it as we do to the court's resolution of contested facts. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. As discussed, there is enough circumstantial evidence to support the court's finding of knowledge here.

## 2. ALTERNATIVE REASON

According to appellants, even if political animus were *a* motivating factor in their demotion of Gierbolini, they proved by a preponderance of the evidence that they would have reached the same decision in the absence of that factor (because Gierbolini was incompetent), and that their action was thus constitutionally valid. *See Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The district court explicitly found that appellants' claims of Gierbolini's incompetence were not credible, and that appellants' "sole purpose in concocting the negative evaluation [that formed the basis for his demotion] was to remove Gierbolini as Director of the Radio Station because, as a member of the NPP, Gierbolini did not share defendants' political affiliation." The court thus concluded

that appellants "would not have removed Gierbolini but for his political affiliation."

Appellants advanced at trial several examples of Gierbolini's alleged managerial incompetence:

1) During Gierbolini's tenure as director a "spiritualist session"[7] took place at the station, apparently diverting employees from their duties for a couple of hours. Appellants claim Gierbolini did not stop the session, and brought unfavorable publicity to the station by discussing the incident with the press.

2) Gierbolini did not put in long enough hours at the station.

3) Some public address equipment in the station's custody apparently disappeared sometime during Gierbolini's tenure. Gierbolini had at one point signed a form indicating that the equipment was at the station.

4) Problems arose with employee scheduling. On one occasion no one had been assigned to do a particular newscast, so there was no newscast. Due to employee dereliction, the station did not always go on the air at its regularly scheduled time.

An important finding of the district court, relative to the credibility of these allegations, was that neither of the appellants ever met with Gierbolini, either before or after his evaluation, to discuss with him their plans for the management of the station and, inferentially, whatever criticisms they had of him. The district court found, with respect to the spiritualist session, that Gierbolini had duly made a report of the incident, naming the persons involved; that he himself had no power to discipline the individuals involved; that at the time of trial no type of disciplinary action had been taken against the offending employees; and that the Department grievance committee that investigated the

---

6. It is the significant amount of circumstantial evidence here that allows us to distinguish a case such as *Vargas–Figueroa v. Saldana,* 826 F.2d 160 (1st Cir.1987), where this court reversed a preliminary injunction when the *only* evidence of defendants' political motivation was that 1) they themselves were PDP and 2) the PDP won the 1984 election. *See id.* at 163.

7. It is unclear from the record what actually transpired at this mysterious event. Gierbolini testified that, as part of the session, pig legs had been hung on the door of a station office. The district court understood the session to be some sort of a seance, featuring, inter alia, levitation of a table.

**336**

event ultimately concluded that the activity had not been improper. All of these findings are supported by evidence. The court also found—again, with evidentiary support—that Mercado Rosa's testimony as to Gierbolini's insufficient hours was contradicted by Mercado Rosa's own evaluation of Gierbolini, in which Gierbolini was rated as fulfilling all attendance and punctuality requirements.

To be sure, the court also made certain findings for which we find little record support. For example, the court dismissed the significance of the "missing equipment" incident because the equipment had arrived at the station in 1977, when Gierbolini was but a scriptwriter, and because Gierbolini had submitted a full report on the incident to Mercado Rosa when the latter had so requested. It is unclear how Gierbolini was thus relieved of his alleged accountability for the equipment when he was director. The court also found appellants' allegations of personnel problems under Gierbolini to be unsubstantiated, a finding belied by the testimony relating to the station's difficulty with scheduling and with going on the air on time. *See supra.*

Still, we cannot say, on the evidence as a whole, that the court committed clear error in concluding that appellants' assertions of Gierbolini's incompetence were essentially pretextual. Appellants' failure to communicate with Gierbolini, coupled with the implausibility of some of their allegations of incompetence, gave the court an adequate evidentiary basis for its ultimate conclusion.

*Affirmed.*